# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>RTI HOLDING COMPANY, LLC, *et al.*,[1]<br><br>Reorganized Debtors. | Chapter 11<br><br>Case No. 20-12456 (JTD)<br><br>(Jointly Administered) |
| RUBY TUESDAY OPERATIONS LLC,<br><br>Plaintiff,<br><br>v.<br><br>LENOX OUTDOOR & ADVERTISING, LLC,<br><br>Defendant. | Adv. Proc. No. _____ |

## COMPLAINT

Ruby Tuesday Operations LLC ("RTO"), successor-in-interest to Ruby Tuesday, Inc.

("RTI") pursuant to the *Debtors' Second Amended Chapter 11 Plan, as Modified* [D.I. 1135] (the

"Plan") and one of the reorganized debtors (together with the affiliated debtors, the "Debtors" or

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's U.S. tax identification number are as follows: RTI Holding Company, LLC (4966); Ruby Tuesday, Inc. (5239); Ruby Tuesday, LLC (1391); RTBD, LLC (6505); RT of Carroll County, LLC (8836); RT Denver Franchise, L.P. (2621); RT Detroit Franchise, LLC (8738); RT Distributing, LLC (6096); RT Finance, LLC (7242); RT FL Gift Cards, Inc. (2189); RT Florida Equity, LLC (7159); RT Franchise Acquisition, LLC (1438); RT of Fruitland, Inc. (1103); RT Indianapolis Franchise, LLC (6016); RT Jonesboro Club (2726); RT KCMO Franchise, LLC (7020); RT Kentucky Restaurant Holdings, LLC (7435); RT Las Vegas Franchise, LLC (4969); RT Long Island Franchise, LLC (4072); RT of Maryland, LLC (7395); RT Michiana Franchise, LLC (8739); RT Michigan Franchise, LLC (8760); RT Minneapolis Franchise, LLC (2746); RT Minneapolis Holdings, LLC (7189); RT New England Franchise, LLC (4970); RT New Hampshire Restaurant Holdings, LLC (7438); RT New York Franchise, LLC (1154); RT Omaha Franchise, LLC (7442); RT Omaha Holdings, LLC (8647); RT One Percent Holdings, LLC (6689); RT One Percent Holdings II, LLC (2817); RT Orlando Franchise, LP (5105); RT Restaurant Services, LLC (7283); RT South Florida Franchise, LP (3535); RT Southwest Franchise, LLC (9715); RT St. Louis Franchise, LLC (6010); RT Tampa Franchise, LP (5290); RT Western Missouri Franchise, LLC (6082); RT West Palm Beach Franchise, LP (0359); RTTA, LP (0035); RTT Texas, Inc. (2461); RTTT, LLC (9194); Ruby Tuesday of Allegany County, Inc. (8011); Ruby Tuesday of Bryant, Inc. (6703); Ruby Tuesday of Columbia, Inc. (4091); Ruby Tuesday of Frederick, Inc. (4249); Ruby Tuesday of Linthicum, Inc. (8716); Ruby Tuesday of Marley Station, Inc. (1641); Ruby Tuesday of Pocomoke City, Inc. (0472); Ruby Tuesday of Russellville, Inc. (1601); and Ruby Tuesday of Salisbury, Inc. (5432). The Debtors' mailing address is 333 East Broadway Ave., Maryville, TN 37804.

"Reorganized Debtors"), by and through its undersigned counsel, files this Complaint against Lenox Outdoor & Advertising, LLC ("Lenox") and alleges as follows:

## NATURE OF THE ACTION

1.      RTO and its affiliates develop, operate, and franchise casual dining restaurants under the Ruby Tuesday® brand.  One of the most profitable restaurants (the "Restaurant") is located a short distance from Atlanta's Hartsfield-Jackson International Airport and Interstate 85.

2.      The Restaurant is located on a small tract of land (the "Restaurant Property") that RTO leases pursuant to the *Ground Lease* entered into on or about October 27, 2003 (the "Lease") between RTI and SMS Hotel Equities, Inc. ("SMS"), the predecessor-in-interest to Lenox, the current lessor.  The Lease, including the amendments thereto, is attached hereto as **Exhibit A**.

3.      The Restaurant Property is located at the corner of an intersection that does not contain any parking spaces, and the Restaurant building and service entrance occupy almost all of the Restaurant Property.

4.      As such, in negotiating the Lease, RTI bargained for a perpetual, uninterrupted right to utilize parking for its customers, employees, and invitees in a parking lot (the "Parking Lot") adjacent to the Restaurant Property along Virginia Avenue (as defined in the Lease, the "Adjacent Property").

5.      The perpetual, uninterrupted right to parking is an essential part of the Lease. Parking on the Adjacent Property is so vital to RTI's operations that the parties included several protective provisions in the Lease to prevent RTI's parking rights from being threatened or terminated.

6.      Unfortunately, the original lessor and all successor lessors, including Lenox, have breached and defaulted on their covenants, obligations, representations, and warranties under the

Lease. In doing so, they jeopardized RTI's parking rights and, in turn, its ability to successfully continue operations at the Restaurant.

7. RTI was therefore forced to take action to protect its parking rights. For more than a decade—well before and well after Lenox assumed the Lease—RTI (and now RTO) has been forced to pay not only for the parking rights it was promised under the Lease at no additional cost, but for the expenses of ensuring those rights are not terminated or otherwise infringed. In accordance with its contractual rights, RTI (and now RTO) has setoff the sums it has expended against its monthly rental payment under the Lease, and continues to do so. In fact, in accordance with the Rent-Free Clause and Lessor Default Provision (both as defined herein), neither RTI nor RTO has been required to make a rental payment to Lenox or the previous lessors for more than a decade.

8. Now, years later and only after the Debtors filed their bankruptcy petitions, Lenox has done an about-face, claiming it is owed rent it has long-known RTI was not obligated to pay under the Lease, filing a proof of claim and cure objection for alleged unpaid rent, and serving RTO with a default notice. Not only is Lenox's newfound position contrary to the Lease, it is at odds with years of conduct by Lenox, its predecessors-in-interest, and RTI.

9. Accordingly, RTO brings this action (a) seeking declaratory relief, damages, and attorneys' fees, (b) objecting to the Cure Claim (as defined herein) pursuant to Rules 3007(b) and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and (c) responding to the Cure Objection (as defined herein).

**PARTIES**

10. RTO is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Tennessee. RTO is the successor-in-interest to

RTI pursuant to the Plan and one of the Reorganized Debtors. RTI is a Georgia corporation and one of the Reorganized Debtors. RTI was the original lessee under the Lease.

11.     Lenox is, upon information and belief, a limited liability company organized under the laws of Georgia, with its principal place of business in Atlanta, Georgia. Lenox is the purported current fee owner of the Restaurant Property and current lessor under the Lease.

## RELEVANT NON-PARTIES

12.     SMS was the original lessor under the Lease, having entered into the Lease with RTI. SMS is the predecessor-in-interest to Lenox.

13.     The City of Atlanta, Georgia (the "City") is the owner of the Adjacent Property. The City originally leased the Adjacent Property to Carousel Hotel Corporation (the predecessor-in-interest to Diplomat Construction, Inc. and Khushal Hospitality, LLC) pursuant to the *Restated and Consolidated Lease Agreement* dated December 9, 1997 (the "Hotel Lease"). The Hotel Lease, including the amendments thereto, is attached hereto as **Exhibit B**.

14.     Diplomat Construction, Inc. ("Diplomat") leased the Adjacent Property from the City at the time RTI entered into the Lease with SMS. Diplomat shared common ownership and management with SMS.

15.     Khushal Hospitality, LLC ("Khushal") is the current owner and operator of the Hotel (as defined herein), which is located on the Adjacent Property. Following Diplomat's 2009 bankruptcy filing, Khushal obtained Diplomat's interest in the Hotel Lease and leased the entirety of the Adjacent Property until its leasehold (including the parcel on which RTI possessed parking rights) was terminated in June 2014.

16.     Rajesh C. Patel a/k/a R.C. Patel ("R.C. Patel") is a hotel owner and developer based in or around Duluth, Georgia. Upon information and belief, R.C. Patel is or was an owner, officer,

and/or controller of Lenox, SMS, Diplomat, World Debt Acquisitions, LLC, and Horizon Bank (later known as Haven Trust Bank). Following an FBI investigation and 10-count indictment in the U.S. District Court in the Middle District of Tennessee, R.C. Patel pled guilty in 2016 to wire fraud arising from an investment deal involving a mortgage on an Atlanta hotel and was sentenced to six months in prison.

17. Upon information and belief, Mukesh C. Patel a/k/a Mike Patel ("Mike Patel") is or was an owner, officer, and/or controller of Lenox, SMS, Diplomat, World Debt Acquisitions, LLC, and Horizon Bank (later known as Haven Trust Bank). Mike Patel is the brother of R.C. Patel.

18. Rishi Patel ("Rishi Patel") is the son of Mike Patel and nephew of R.C. Patel. Rishi Patel is an owner and/or officer of Lenox.

## JURISDICTION AND VENUE

19. This adversary proceeding arises under, arises in, and relates to the above-captioned chapter 11 cases pending before this Court.

20. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012. This Court has jurisdiction to grant the relief sought herein under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*.

21. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (C). Accordingly, the Court may enter a final order or judgment consistent with Article III of the United States Constitution. Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, RTO consents to the entry of a final order or judgment by the Court if it is determined that the Court,

absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

22.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

23.     The statutory predicates for the relief requested herein are 11 U.S.C. § 105 and Bankruptcy Rules 3007 and 7001.

## FACTUAL ALLEGATIONS

## I.     RTI Enters into Lease and Constructs the Restaurant Based On Its Perpetual, Uninterrupted Parking Rights on the Adjacent Property

24.     RTI paid for the construction of the Restaurant and has paid substantially all expenses of the Restaurant Property since the inception of the Lease, including but not limited to real property taxes.

25.     The Restaurant sits on 0.27 acres of land at 1230 Virginia Avenue, East Point, Georgia.  The Restaurant Property is situated in a commercially-zoned area approximately one block from Interstate 85 and minutes from Hartsfield-Jackson International Airport at the intersection of Virginia Avenue and Toffie Terrace, both of which are 4- to 5-lane, heavily-trafficked roadways.  Neither roadway has street parking abutting the Restaurant Property.

26.     Hartsfield-Jackson International Airport is the busiest airport in the United States, and prior to the COVID-19 outbreak was the busiest airport in the world.

27.     The Restaurant Property itself has no parking.  Instead, the only suitable parking for the Restaurant was and is located on the Parking Lot on the Adjacent Property.  Parking at any other location in the immediate area would require the Restaurant's customers, employees, and other invitees to walk significant distances in an area with high crime rates and cross heavily-trafficked roads covering multiple lanes.

28.     The Adjacent Property is owned by the City.  The Adjacent Property is currently comprised of four parcels and one tract of land.  Parcel 2 contains the Parking Lot that is subject to RTI's parking rights, and Parcel 4 contains the driveway from Virginia Avenue used to access the Parking Lot.  Parcel 1 holds a 6-story, 192-room hotel (the "<u>Hotel</u>"), which currently operates as a La Quinta Inn & Suites by Wyndham, as well as the Hotel's enclosed parking spaces.

29.     The following photograph shows the approximate locations of the respective properties and parking:



30.     Given RTI's substantial investment in constructing and operating the Restaurant and the necessity of suitable parking, RTI undertook several courses of action to ensure it maintained its rights to nearby parking.

31.     First, prior to entering the Lease, RTI applied for and received a variance of zero parking spaces from the City of East Point, whose applicable zoning ordinances initially required 67 parking spaces on the Restaurant Property in order for RTI to operate the Restaurant.

32.     Diplomat supported RTI's Application for Variance.  Indeed, Diplomat submitted a letter to the City of East Point signed by R.C. Patel as CEO, stating in part: "[Diplomat] shall grant [RTI] a parking easement over the [Adjacent Property]."  The letter from Diplomat is attached hereto as **Exhibit C**.

33.     R.C. Patel also signed an affidavit stating that he authorized "Diplomat Companies to act as applicant in pursuit of this pursuit of a variance of this property."

34.     Section 2 of the Application for Variance provides:

> Sixty-seven (67) spaces will be required.  The building will be built in conjunction with a proposed hotel on the adjacent parcel.  The adjacent parcel is in the City Limits of Hapeville.  A parking easement for the entire required amount will be provided to Ruby Tuesday on this adjacent tract.  The variance request is to allow all of the required parking to be on the adjacent parcel.

35.     Section 3 of the Application for Variance provides, "[i]n order to develop this lot in the City of East Point, an offsite parking variance is required."

36.     Section 7 of the Application for Variance provides, "[t]he site will not have self-contained parking.  All required parking will be provided on the adjacent hotel parcel via a shared parking easement.  The lot that will contain the offsite parking spaces lies contiguous to and shares a common boundary line with the subject property."

37.     On April 21, 2003, the City of East Point granted RTI's request for a variance to allow zero parking spaces on the Restaurant Property.

38.     Approximately six months after this variance, RTI entered into the Lease for the Restaurant Property with SMS.  The Lease was signed on behalf of SMS by R.C. Patel, as CEO.

39.     At the time RTI entered into the Lease, the City leased the Adjacent Property to Diplomat (successor-in-interest to Carousel Hotel Corporation) pursuant to the Hotel Lease. Section 4.01 of the Hotel Lease provides:

> Said Leased Premises shall be used by Lessee for the construction, maintenance, and operation of a motel, with the right to maintain and carry on therein those operations and facilities which customarily are incident to the maintenance and operation of a motel.  The Leased Premises shall not be used for any other purpose; and the Leased Premises shall not be used for any outdoor advertising, except for the name and facilities of the motel.  No Part of said Leased Premises shall be used for any purpose other than for the use or benefit of guests or patrons of the motel and its facilities.

(Hotel Lease § 4.01).

40.     At the time the Lease was entered into, R.C. Patel and Mike Patel were owners and officers of both SMS and Diplomat.

41.     The Lease has an initial 20-year term and provides for a 5-year automatic renewal term absent a notice of cancellation from, or default by, RTI (subject to any applicable grace period), and a second, similar 6-year renewal term following that.  (Lease §§ 2(A)-(C)).  Including the renewals available to RTO, the Lease expires on December 31, 2034.  (*Id.* § 2).

42.     Section 1 of the Lease states that "[i]n addition to Lessor owning fee title to the Leased Premises, an affiliate of Lessor has a leasehold interest to property fronting Virginia Avenue at Toffie Terrace Drive and immediately adjacent to the Leased Premises."  (Lease § 1).

43.     SMS made certain representations and warranties in the Lease.

44.     Pursuant to section 17(E) of the Lease, SMS and all successor lessors, including Lenox, "represents, to the best of its knowledge, that at the time of the execution of this Lease during the term hereof, or any extensions hereof, that no . . . other document, shall conflict in any respect with the terms of this Lease." (Lease § 17(E)).

45.     Likewise, section 41 of the Lease provides that:

> [SMS], to the best of its knowledge, hereby warrants, represents and acknowledges, the following: . . .
>
> C. No consent or approval by any governmental authority, except for the issuance of the building permit and necessary business licenses will be required on the part of Ruby Tuesday in order to transact its business under the terms of this Lease. . . .
>
> I. This Lease does not violate or conflict in any material way with (such as, but not limited to, provisions relating to exclusiveness, sale of food, sale of alcoholic beverages, exterior signage, hours of operation, or the like) the terms of any other Lease applicable to the Adjacent Property or the terms of any reciprocal operating agreement, cross easement agreement, restrictive covenants, or any other document subject to any governmental approvals.

(Lease § 41).

46.     RTI and SMS included several provisions in the Lease pertaining to parking. These contractual safeguards were specifically negotiated and were necessary to ensure perpetual, uninterrupted rights to parking in the Adjacent Property.

47.     As an initial point, SMS covenanted in the Lease that "[RTI], its employees, customers and invitees shall have a perpetual, uninterrupted, non-exclusive right for parking on the Adjacent Property." (Lease § 17(A)).

48.     Further, after obligating SMS to provide sufficient parking on the Adjacent Property, the Lease continues:

> Lessor hereby represents and warrants that it shall not cause, by action or inaction, the lease of the Adjacent Property to terminate or expire during the Term of this Lease.... In the event the lease for the Adjacent Property is permanently terminated, then Ruby Tuesday shall not be obligated to Lessor for any payments due under this Lease and may remain on the Leased Premises free of charge for the remainder of the term of this Lease.

(Lease § 1) (the "Rent-Free Clause").

49.     Thus, in the event the lease of the Adjacent Property is terminated, the Rent-Free Clause eliminates RTI's obligation to make rental payments and permits RTI to remain on the Restaurant Property free of charge for the remainder of the term of the Lease.

50.     The Lease also requires SMS to promptly execute a Memorandum of Lease to be recorded.  (Lease § 37).  SMS never did so, thereby breaching its contractual obligation.

51.     The Lease further permits RTI to recover sums and setoff its payment obligations in the event of breach by the lessor:

> If Lessor shall breach any warranty or fail to perform any covenant required to be performed by Lessor under the terms of this Lease and such breach or failure shall continue for a period of thirty (30) days after receipt by Lessor of written notice thereof from Ruby Tuesday or if Lessor shall fail to pay any sums due to Ruby Tuesday hereunder, and such failure shall continue for a period of thirty (30) days after receipt by Lessor of written notice thereof from Ruby Tuesday, then Ruby Tuesday may, in addition to any of Ruby Tuesday's other rights set forth elsewhere in this Lease, (a) cure any default or breach of warranty of Lessor hereunder, and perform any covenants which Lessor has failed to perform, and any sums expended by Ruby Tuesday in curing such default or breach of warranty and performing such covenants shall be paid by Lessor to Ruby Tuesday immediately upon demand, shall bear interest at the rate of twelve (12%) percent per annum from the date of demand, and may be offset by Ruby Tuesday against future rentals; (b) bring suit to recover from Lessor all sums due Ruby Tuesday from Lessor together with interest at the rate of twelve (12%) percent per annum thereon; and/or (c) declare this Lease to be terminated, in which event Ruby Tuesday shall have no further liability hereunder.

(Lease § 21) (the "Lessor Default Provision").

52.     Thus, in the event of an uncured breach by SMS, the Lessor Default Provision permits RTI to cure any default of SMS and recover or setoff against its rental obligations all sums expended in curing the default, plus 12% annual interest.

53.     Finally, the Lease contains a fee-shifting provision, which provides:

> In the event of any suit, action or proceeding at law or in equity, by either of the parties hereto against the other by reason of any manner or thing arising out of this Lease, the prevailing party shall recover, not only its legal costs, but a reasonable attorney's fee (to be figured by the Court) for the maintenance or defense of said action or suit, as the case may be.

(Lease § 31).

54.     The Lease was amended twice: through the First Amendment to Ground Lease dated March 2005 (the "First Lease Amendment") and the Second Amendment to Ground Lease dated May 2005 (the "Second Lease Amendment"). Both amendments were signed by R.C. Patel as CEO of SMS.

55.     The Lease has been assigned a number of times since its execution. SMS assigned the Lease to Horizon Bank on November 19, 2004. R.C. Patel and Mike Patel were owners of Horizon Bank. Horizon Bank, which changed its name to Haven Trust Bancorp, Inc., entered into a receivership with the Federal Deposit Insurance Corporation ("FDIC"). FDIC assigned the Lease to Matrix Advisors, LLC on or about April 30, 2009. Matrix Advisors, LLC assigned the Lease to World Debt Acquisitions, LLC on or about December 21, 2011.

56.     On or about April 3, 2012, World Debt Acquisitions, LLC, a company owned and controlled by R.C. Patel, Mike Patel, and other family members, executed a *Deed Under Power of Sale* from SMS to World Debt Acquisitions, LLC. The name of the person signing on behalf of World Debt Acquisitions, LLC is blank.

57.     A few months later, World Debt Acquisitions, LLC executed a Quit Claim Deed of the Restaurant Property to Lenox without any consideration being paid by Lenox, which was recorded on December 18, 2012.

58.     Lenox acquired the Lease by assignment from World Debt Acquisitions pursuant to an *Assignment and Assumption of Lease* dated December 18, 2012 (the "Lenox Assignment"). The Lenox Assignment was not recorded in the real property records of Fulton County, Georgia until July 31, 2020.  The Lenox Assignment is attached as **Exhibit D**.

59.     The Lenox Assignment provides that Lenox acquired "all of Assignor's right, title, interest, obligations and duties in the Lease."  (Lenox Assignment § 1).

60.     The Lenox Assignment further provides that Lenox:

> accept[ed] the aforesaid assignment of the Lease and assume[d] and agree[d] to be bound by and timely perform, observe, discharge, and otherwise comply with Assignor's agreements, duties, obligations, covenants and undertakings under the Lease....

(Lenox Assignment § 2).

61.     In addition to Lenox's express assumption, section 38 of the Lease provides "[w]herever used herein, the words 'Lessor' and 'Ruby Tuesday' shall be deemed to include the heirs, personal representatives, legal representatives, successors, sublessees and assigns of said parties, unless the context excludes such construction."  (Lease § 38).

62.     Similarly, section 44 provides, "[t]he terms, conditions and covenants of this Lease shall be binding upon and shall inure to the benefit of each of the parties hereto, their heirs, personal representatives, legal representatives, successors or assigns, and shall run with the land."  (Lease § 44).

63.     The Lease provides for "Lessor Contribution" (as defined therein), which SMS was required to pay to RTI in the amount of $400,000.00 within 15 days of RTI's final invoice to SMS.

The Lessor Contribution was put into place "to compensate [RTI] for the preparation of the plans and specifications, pay for permits, and construct the proposed restaurant improvements on the [Restaurant Property]." (Lease § 24).

64.     SMS did not pay the Lessor Contribution within the time allotted under the Lease.

65.     The Lease obligated RTI to pay, in equal monthly payments of $3,250.00, "Lessor Contribution Rent" in the annual amount of $39,000.00. (Lease § 4(B)).

66.     In the First Lease Amendment, SMS again agreed to pay RTI the Lessor Contribution in the amount of $400,000.00, this time by April 1, 2005.

67.     Through the First Lease Amendment, SMS also assigned its right to receive, and directed RTI to pay, Lessor Contribution Rent to Brij Kapoor.

68.     Upon information and belief, in mid-April 2005, RTI received a check in the amount of $400,000.00 from Kapoor for the Lessor Contribution.

69.     Under the Second Lease Amendment, the parties agreed to eliminate their respective obligations to pay Lessor Contribution and Lessor Contribution Rent. They agreed that both obligations would be eliminated upon RTI's payment to Kapoor of $403,250.00, and the assignment of payments to Kapoor set forth in the First Lease Amendment would be rescinded.

70.     The Second Lease Amendment provides that upon RTI's payment of the lump sum of $403,250.00 (the "Lessor Contribution Satisfaction Payment"), RTI "shall no longer be required to pay the Lessor Contribution Rent to either Lessor [i.e., SMS] or to Kapoor." (Second Lease Amendment ¶ 2).

71.     One day after executing the Second Lease Amendment, RTI paid the Lessor Contribution Satisfaction Payment. A check in the amount of $400,000.00, Reference Number 0001811909, dated May 13, 2005 and payable to Brij Kapoor is attached hereto as **Exhibit E**.

72.     Neither Kapoor nor SMS nor any of its successors-in-interest, including Lenox, ever contended prior to the bankruptcy filing that RTI had failed to pay the Lessor Contribution Satisfaction Payment.

73.     After the bankruptcy filing, Lenox claimed for the first time that the Lessor Contribution Satisfaction Payment had not been paid.

## II.     The City Objects to RTI's Use of the Parking Lot and Demands Additional Rent For Parking

74.     SMS's failure to execute a Memorandum of Lease constituted a breach of the Lease.

75.     On February 6, 2007, RTI filed suit against several parties—including Diplomat, SMS, and R.C. Patel—in Georgia state court for, among other things, specific performance and breach of contract in connection with parking and other rights (the "State Court Litigation").

76.     During the pendency of the State Court Litigation, the City had become aware that Diplomat was allowing RTI to use the Adjacent Property for parking.  The City asserted that its Hotel Lease with Diplomat did not permit RTI's parking on the Adjacent Lot and demanded additional parking rent in exchange for its consent.

77.     On April 2, 2009, to resolve the breach of the Hotel Lease, the City and Diplomat entered into the *Amendment to Restated Consolidated Lease Agreement* (the "First Hotel Lease Amendment").

78.     The First Hotel Lease Amendment recognized RTI's parking rights with respect to the Adjacent Property.  Notably, the amendment acknowledged that RTI had "insufficient... parking... and require[s] use of the Hotel Tract [i.e., the Adjacent Property]," and confirmed the desire of Diplomat and the City to "allow for parking by customers and employees of Ruby Tuesday and certain successors on the Hotel Tract."  (First Hotel Lease Amendment at 1).  It

further permitted Diplomat "to enter into a license with Ruby Tuesday or its successor to allow parking, signage, access and maintenance rights for the benefit of the [Restaurant Property]." (*Id.* § 2).

79.    The First Hotel Lease Amendment also required Diplomat to pay the City $36,758.33 in parking rent accrued through March 31, 2009 (the "Parking Back Rent") and $1,814.58 per month thereafter (i.e., $21,775.00 annually).  (First Hotel Lease Amendment § 1).

## III.    Diplomat Files Bankruptcy One Day After Amending the Hotel Lease

80.    On April 3, 2009—one day after the City and Diplomat executed the First Hotel Lease Amendment—Diplomat filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Georgia (the "Georgia Bankruptcy Court") commencing Case No. 09-68613.  R.C. Patel signed Diplomat's bankruptcy petition as CEO.

81.    During the bankruptcy case, Diplomat assumed the Hotel Lease, including the parking amendment affecting RTI, which was approved by the Georgia Bankruptcy Court.  The case was subsequently converted to a case under chapter 7 of the Bankruptcy Code, and a chapter 7 trustee was appointed (the "Chapter 7 Trustee").

### A.    RTI Finally Receives a Parking License and Fulfills Diplomat's Payment Obligations to the City

82.    On May 28, 2009, Diplomat filed its *Motion of Diplomat Construction, Inc. to Approve Compromise and Settlement* (the "Settlement Motion"), in which Diplomat and SMS, yet again, promised that Diplomat would grant RTI an irrevocable parking license, Diplomat would pay $20,000 to RTI, and RTI would pay Diplomat the amount of parking rent charged by the City to Diplomat.

83.     In turn, SMS agreed that RTI's rent for the Restaurant Property would be abated by the amount that RTI paid on behalf of Diplomat for the parking rent. In fact, Diplomat's Settlement Motion attached an unexecuted Third Amendment to the Restaurant Lease between SMS and RTI, which provides, *inter alia*:

> For so long as Ruby Tuesday desires to maintain its rights under and receive the benefits of the [the proposed license from Diplomat], Ruby Tuesday shall pay to [Diplomat] or as directed by [Diplomat], in connection with its execution of the [proposed license from Diplomat] in U.S. dollars, an amount equal to the Monetary Condition, as defined in Section 6(A) of the [proposed license from Diplomat] (the "Parking Charge") and is currently $1,814.48 per month, which amount shall be due and payable in accordance with the [proposed license from Diplomat]; provided, however, that upon payment but only upon payment of the Parking Charge by Ruby Tuesday, the Land Lease Rent due and payable under Section 4 of the Lease shall be abated by the equivalent amount.

(Settlement Motion at 67-68).

84.     In November 2009, Diplomat sent a check to the City for $36,758.33. However, the check was ultimately dishonored, and Diplomat never paid the Parking Back Rent or any of the monthly payments.

85.     On November 23, 2009, the Georgia Bankruptcy Court approved this settlement of the State Court Litigation and entered an *Order Approving Debtor's Settlement with Ruby Tuesday, Inc.* (the "Settlement Order") memorializing the settlement. The Settlement Order provides in relevant part:

> The settlement grants Ruby Tuesday, Inc. ("Ruby Tuesday") a license for 65 parking spaces on the Debtor's Hotel property to be used by its patrons, requires execution of an amendment to the Debtor's Ground Lease with the City of Atlanta to allow the Debtor to sub-lease the parking spaces to Ruby Tuesday (the "Parking Amendment"), and requires payment of past-due and ongoing rent to the City of Atlanta to compensate for Ruby Tuesday's use of the parking spaces.

86. Diplomat failed to execute any of the necessary settlement documents or perform any of its obligations under the Settlement Order.

87. For example, Diplomat failed to execute the proposed license or pay the City any of the past-due or ongoing rent related to RTI's use of the Parking Lot.

88. On January 7, 2010, the City filed a motion for relief from the automatic stay in Diplomat's bankruptcy case.

89. Thereafter, the City demanded payment in full of the Parking Back Rent and additional monthly parking rent that had accrued to be paid prior to the hearing on its stay relief motion.

90. In order to prevent the City from obtaining stay relief and terminating the Hotel Lease, RTI had no choice but to pay the Parking Back Rent and monthly parking rent directly to the City and offset the same from its rental payments under the Lease.

91. As a result, and to ensure RTI's right to use the Parking Lot was not compromised, RTI paid directly to the City $36,758.33 in Parking Back Rent, as well as $1,814.58 in monthly parking rent beginning November 2009 and continuing through the date hereof. Thus, RTI has paid hundreds of thousands of dollars in parking rent (and at least $1,814.58 per month hereafter) and hundreds of thousands of dollars in attorneys' fees and expenses in its efforts to cure the lessors' continuing breaches under the Lease. SMS, as well as Lenox, have long been aware of these payments.

## B. RTI Sets Off Its Parking Rental Payments

92. Because RTI paid the parking rent amounts owed by Diplomat to the City, RTI setoff those amounts against rent owed to Diplomat under the Lease pursuant to and in accordance

with the Lessor Default Provision.  This arrangement occurred for more than a decade by SMS and its successors-in-interest, including Lenox.

93.     RTO and its predecessor-in-interest RTI have collectively setoff against rental payments the sums expended, including all of the parking rental payments and certain attorneys' fees and related costs incurred in curing the failures of SMS and its successors to provide parking on the Adjacent Property plus the mandatory 12% annual interest thereon provided by the Lessor Default Provision.

94.     SMS and Lenox were well aware of the setoff.  In fact, SMS accepted without protest partially offset rental payments for at least four months.

95.     In mid-2010, counsel for RTI had discussions with counsel for SMS regarding the setoff.  In an email dated July 28, 2010, counsel for SMS stated: "I am headed out of town and skimmed the Lease in an effort to understand your offset calculation.  Please connect the dots for me under the Lease and share the contractual basis for the offset by category: legal fees and parking rent.  I do not anticipate an issue with the parking rent provided it's accurately accounted for, but the addition of over $200,000 in legal fees is not acceptable."  Counsel for SMS never followed up on this email nor further contested RTI's setoff rights.  In fact, counsel for SMS acknowledged the setoff in an October 7, 2016 email, stating: "It's my understanding that any rent offset should have ended a few months ago."

### C.     Khushal Acquires Diplomat's Interest in the Lease

96.     State Bank of Texas ("SBT") had a purported security interest in the Hotel Lease.

97.     After obtaining stay relief from the Georgia Bankruptcy Court, SBT scheduled a foreclosure sale.  In response, the City sent SBT a letter dated December 10, 2009 demanding

payment of amounts owed by Diplomat, including $36,758.33 in Parking Back Rent and $1,814.58 in parking rent for December 2009.

98.    On December 15, 2009, SBT filed its *Verified Complaint for Judgement for Breach of Contract, Appointment of a Receiver and Related Injunctive Relief* ("<u>SBT Complaint</u>") and *Emergency Motion for Appointment of a Receiver and Related Injunctive Relief and Memorandum of Law in Support* ("<u>SBT Receiver Motion</u>") in the Superior Court of DeKalb County, Georgia alleging that it faced irreparable harm if the City terminated the Hotel Lease due to Diplomat's failure to pay the parking rent, which would cause SBT to lose its collateral in the Hotel Lease.

99.    For example, SBT alleged:

> [u]pon information and belief, [Diplomat] is in default under its ground lease with the City of Atlanta, which constitutes a violation of Section 6.13 of the Security Deed. The City has stated that on or about November 16, 2009, [Diplomat] made a check to the City as payment upon past due amounts under the Ground Lease, but [Diplomat] subsequently stopped payment on the check causing [Diplomat] to remain in default under the Ground Lease. In the event of a default under the ground lease, the City may argue that it has the right to terminate the lease, which termination (if it occurred) would cause immediate and irreparable harm to [SBT] because [Diplomat's] interest in the ground lease constitutes its primary Collateral.

(SBT Receiver Motion at 5; *see also* SBT Complaint ¶¶ 29-30).

100.    SBT further alleged that it "is informed, believes, and therefore alleges that [Diplomat] is in default under the Ground Lease, thus exposing the Ground Lease to possible termination." (SBT Complaint ¶ 52).

101.    On April 6, 2010, SBT foreclosed on the Hotel Lease. Upon information and belief, there was an error in the legal description in the applicable deed, which prevented SBT from acquiring all of Diplomat's interest in the Hotel Lease. On December 21, 2010, SBT assigned its interest in the Hotel Lease and improvements to Khushal.

102.     Thereafter, Khushal obtained an assignment and sale of Diplomat's remaining interest in the Hotel Lease from the Chapter 7 Trustee in the bankruptcy case.  On September 18, 2012, the Georgia Bankruptcy Court entered an *Order Granting Chapter 7 Trustee's Motion to Approve Sale and Assignment of the Debtor's and the Estate's Rights in Restated and Consolidated Ground Lease with City of Atlanta to Khushal Hospitality, LLP* ("Khushal Sale Order").

103.     The Khushal Sale Order states that "the resolution of the Ruby Tuesday parking issue with this sale and assignment to Khushal benefits the estate by foreclosing future litigation.... [and] the proposed sale is a global settlement that addresses the Ruby Tuesday parking amendment, which is implicated in the estate's interest in the ground lease."  (Khushal Sale Order at 8, 10-11).

**D.     RTI Finally Obtains Parking License Running with Hotel Lease**

104.     To resolve RTI's objections to the Chapter 7 Trustee's proposed sale of the Hotel Lease, RTI, the Chapter 7 Trustee, the City, and Khushal reached an agreement regarding RTI's use of the Parking Lot, which was memorialized in three separate documents.

105.     First, the Chapter 7 Trustee and RTI entered into a *License Agreement* dated October 19, 2012 (the "Final Parking License"), which provided RTI with a "non-exclusive, irrevocable license" for 65 parking spaces on the Adjacent Property along with ingress and egress rights until the earlier of December 31, 2034 or termination of the Lease.  (Final Parking License §§ 1, 2).  The parties agreed that RTI would pay directly to the City the monthly amount for the parking rental.  (*Id.* § 6(B)).  Notably, the Final Parking License expressly states that it runs with the title to the Hotel Lease and Lease.  (*Id.* § 6(C)).  The Final Parking License is attached hereto as **Exhibit F**.

106.     Second, RTI and Khushal entered into an *Estoppel Agreement* dated October 19, 2012 (the "Estoppel Agreement").  As set forth in the Estoppel Agreement, Khushal agreed to

recognize and not interfere with RTI's parking and access rights under the Final Parking License. (Estoppel Agmt. § 1). Khushal also agreed to faithfully perform the Chapter 7 Trustee's obligations under the Final Parking License upon its acquisition of the Chapter 7 Trustee's interest. (*Id.*). The term of the Estoppel Agreement was the same as the Final Parking License. (*Id.* § 2). The Estoppel Agreement is attached hereto as **<u>Exhibit G</u>**.

107. Third, the Chapter 7 Trustee and Khushal entered into the *Assignment and Assumption of Ground Lease* dated October 19, 2012 (the "<u>Assignment</u>"). Pursuant thereto, the Chapter 7 Trustee assigned all of his rights and obligations under the Lease and Final Parking License to Khushal. The Assignment is attached hereto as **<u>Exhibit H</u>**.

108. The Final Parking License, Estoppel Agreement, and Assignment were recorded in the Fulton County, Georgia real estate records on October 25, 2012.

## IV. Khushal Relinquishes Its Leasehold of the Adjacent Property, Triggering the Rent-Free Clause

109. The City and Khushal subsequently entered into the *Second Amendment to Restated Consolidated Lease Agreement* dated as of June 20, 2014 (the "<u>Second Hotel Lease Amendment</u>").

110. Although RTI previously obtained the Final Parking License from the Chapter 7 Trustee two years prior, the City and Khushal agreed to terminate Khushal's lease of most of the Adjacent Property, including the Parking Lot that was subject to the Final Parking License.

111. As a result, Khushal leased only the parcel of the Adjacent Property on which the Hotel was located – a parcel that was not subject to the Final Parking License.

112. The Second Hotel Lease Amendment further provides that Khushal would construct a new parking area (within the area in which RTI had parking rights under the Lease), and that the City may grant a license to RTI to use up to 65 of those parking spaces. (Second Hotel Lease Amendment § 2).

113.     Accordingly, the Second Hotel Lease Amendment terminated Khushal's lease of the Adjacent Property for purposes of RTI's Lease.

114.     As such, the Rent-Free Clause was triggered, which entitled RTI to "not be obligated... for any payments due under th[e] Lease" and to "remain on the Leased Premises free of charge for the remainder of the term of th[e] Lease."  (Lease § 1).

## V.     RTI Has Had No Obligation to Pay Rent Under the Lease For More Than a Decade

115.     Since November 2009, RTI has made all monthly parking rental payments of $1,814.58 directly to the City.

116.     RTI setoff its rental payments under the Lease beginning in November 2009.

117.     The amount of RTI's expenditures in curing the lessors' defaults under and breaches of the Lease, plus the 12% interest per annum on such sums, has exceeded the amount of the rental payments owed by RTI (and now RTO) since the commencement of RTI's setoff.

118.     The setoff is permitted and proper under the Lease.

119.     Those sums expended include the monthly parking rental payments made by RTI to the City since November 2009, as well as attorneys' fees and other expenses necessary to cure the failures of SMS and its successors, including Lenox, to provide perpetual, uninterrupted parking rights on the Adjacent Property.

120.     In addition to its setoff rights, since June 2014, RTI has been entitled to remain on the Restaurant Property free of charge through December 31, 2034.

121.     Lenox and its predecessors-in-interest have permitted RTI to remain on the Restaurant Property despite not making any rental payments.  Indeed, despite RTI having paid no rent under the Lease for approximately 11 years, Lenox has never taken any legal action to challenge or dispute RTI's exercise of its rent-free and setoff rights.

122.     RTO continues to remain on the Restaurant Property rent-free, and maintains its right to setoff its expenses and interest thereon against its monthly rental payments to Lenox.

123.     RTO also continues to incur costs, including reasonable attorneys' fees, as a result of Lenox's breach of the Lease, including fees and expenses incurred in bringing this action.  Those fees are necessary, and can be properly setoff against any rental payment obligations as a result of Lenox's continuing breaches, including Lenox requiring RTO to bring this action to enforce its rights and to contest Lenox's Cure Claim and Cure Objection (as defined herein).

124.     In fact, at the expiration of the Lease's term, Lenox will actually owe RTO sums due and expended pursuant to the Lessor Default Provision, including 12% annual interest.

## VI.     The Bankruptcy Case

### A.     RTI Files for Chapter 11

125.     On October 7, 2020, (the "Petition Date"), each of the above-captioned debtors initiated these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

126.     In connection with the Chapter 11 Cases, on December 14, 2020, the Debtors filed their *Notice to Counterparties to Executory Contracts and Unexpired Leases that May Be Assumed and Assigned* [D.I. 723] (as amended by D.I. 1092, the "Assumption Notice").  The Assumption Notice included a list of certain executory contracts and leases that may be designated for assumption by the Debtors and assignment to a successful bidder in connection with a sale of the Debtors' assets.  The Assumption Notice also included the cure amount that must be paid to cure any defaults existing under such contracts and leases based upon the Debtors' books and records. Parties that disagreed with the cure amount and/or objected to the proposed assumption and assignment were required to file an objection by January 29, 2020 that "set[s] forth the specific default or defaults alleged, set[s] forth any such other ground for objection, and set[s] forth any

Cure Amount as alleged by [it], including such documentation and records as supports [its] asserted cure amount." (*See* Assumption Notice at 4).

**B.    Lenox Suddenly Asserts Entitlement to Backrent and Files a POC**

127.    Two days after the Assumption Notice was filed, on December 16, 2020, Lenox filed a proof of claim (Claim No. 10556) (the "<u>Cure Claim</u>") against RTI asserting a general unsecured claim in the amount of $869,467.42 based on the Lease. The Cure Claim alleges that $609,759.42 is necessary to cure defaults under the Lease as of the Petition Date. The Cure Claim is attached hereto as **<u>Exhibit I</u>**.

128.    Although the Cure Claim attached an Exhibit to Proof of Claim and a copy of the Lease, it did not include a breakdown of the amounts allegedly owed or any documentation supporting such amounts.

129.    Prior to filing the Cure Claim, Lenox never demanded unpaid rent or notified the Debtors that there were alleged defaults and amounts due and owing under the Lease.

130.    On January 28, 2021, Lenox filed its *Objection of Lenox Outdoor and Advertising, LLC to Assumption, Cure Amount and Potential Assignment* [D.I. 954] (the "<u>Cure Objection</u>") because "[t]he Assumption Notice identifies obligations due to taxing authorities related to the Lease as the subject of potential assumption and assignment, indicating an intention to keep the Lease in effect, although no provision is made for payment of [Lenox]." (*See* Cure Obj. ¶ 6). Accordingly, Lenox objected to the Debtors' proposed assumption and assignment of the Lease and related cure amount.

131.    The Cure Objection states that the Debtors are currently in default under the Lease for failure to pay rent and other charges currently due and owing, including rent coming due since the Petition Date and back rent in the amount of $649,759.42. (*See* Cure Obj. ¶¶ 11-12). In

addition to rent, the Cure Objection asserts that attorneys' fees should be included in the cure amount under section 365(b)(1)(B) of the Bankruptcy Code.

132.     The Cure Objection attached the Cure Claim, but did not provide the necessary information and documentation required by the Assumption Notice.

133.     While the Cure Objection alleges that the Debtors have failed to pay rent and other charges, it fails to identify the rent that has not been paid (both with regard to the months and amount) or the "other charges."  The Cure Objection likewise fails to set forth the alleged cure amount that Lenox alleges is owed.  In addition, other than attaching the Cure Claim and a copy of the Lease, the Cure Objection does not include any documentation or records supporting the asserted cure amount.

134.     As a result of the deficiencies in the Cure Objection, counsel for RTI requested that Lenox provide a detailed breakdown of all amounts that comprise its Cure Claim.  To date, Lenox has not provided documentation to substantiate the amounts claimed in either the Cure Claim or the Cure Objection.

### C.     The Bankruptcy Court Confirms the Debtors' Plan

135.     On February 17, 2021, the Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Chapter 11 Plan, as Modified* [D.I 1144] (the "<u>Confirmation Order</u>").  As set forth therein, as of the effective date of the Plan, all unexpired executory contracts and leases of the Debtors that have not been rejected shall be deemed assumed by the applicable Debtor and assigned to the designated Reorganized Debtor in accordance with sections 365 and 1123 of the Bankruptcy Code.  (*See* Confirmation Order ¶¶ 27-30).

136.     Among other things, the Confirmation Order provides for the discharge and release of claims against the Debtors pursuant to sections 524(a) and 1141(d) of the Bankruptcy Code (the

"Discharge") as well as the permanent injunction of certain actions, including the commencement or continuation in any manner of any action or other proceeding of any kind on account of or in connection with a discharged and released claim (the "Plan Injunction"). (*See* Plan Art. X).

137. The effective date of the Plan occurred on February 24, 2021 [D.I. 1163]. As a result thereof, the Reorganized Debtors, RT Asset Company (i.e., RTO), Reorganized RTI, and RT Lodge Company (as applicable), as the successors in interest to the Debtors and their estates, shall retain all rights to commence, pursue, litigate, or settle any and all Causes of Action and Litigation Claims (both as defined in the Confirmation Order), including without limitation an adversary proceeding filed in the Chapter 11 Cases. (*See* Confirmation Order ¶ 26).

### D. Lenox Sends a Notice of Default in Violation of the Plan Injunction

138. The Lease requires the lessor to provide notice of default to RTI prior to exercising certain rights "[i]f [RTI] shall fail to pay any installment of rent promptly on the day the same shall become due and payable hereunder". (Lease § 15). Although Lenox now claims that RTI has allegedly been in default since it began withholding rental payments and offsetting its rent nearly 11 years ago, neither Lenox nor any of its predecessors in interest sent a notice of default to RTI until after it sought to assume the Lease in the Chapter 11 Cases.

139. On May 25, 2021, counsel for Lenox sent a *Notice of Default* alleging that "Tenant has defaulted pursuant to the terms of the Ground Lease by, *inter alia*, failing to make all payments to Landlord that have come due from and after the Effective Date, including of Land Lease Rent and Contribution Rent, as those terms are defined in the Ground Lease." Lenox demanded immediate payment of all amounts due and owing that have accrued from and after the effective date of the Plan in an unspecified amount.

140.    In response to the Notice of Default, on June 2, 2021, counsel to RTO sent a letter notifying Lenox that the alleged default is in violation of the Plan Injunction and therefore void.

141.    As a result of Lenox's continuing breaches of the Lease, and in light of RTO's objections and defenses to the Cure Claim and Cure Objection, RTO commenced this adversary proceeding.

## CAUSES OF ACTION

### Count I
### (Declaratory Judgment – Rent-Free Clause)

142.    RTO incorporates by reference the foregoing allegations.

143.    Pursuant to 28 U.S.C. § 2201, *et seq*., the Court has the power to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

144.    The Lease is a valid and enforceable agreement between Lenox, as the successor-in-interest to SMS, and RTO, as the successor-in-interest to RTI.

145.    The Rent-Free Clause provides that SMS, as lessor under the Lease, "represents and warrants that it shall not cause, by action or inaction, the lease of the Adjacent Property to terminate or expire during the Term of th[e] Lease."

146.    The Rent-Free Clause further provides that upon termination or expiration of the Hotel Lease, RTI "shall not be obligated to Lessor for any payments due under th[e] Lease and may remain on the Leased Premises free of charge for the remainder of the term of th[e] Lease."

147.    Lenox, as successor-in-interest to SMS, is the lessor under the Lease and is bound to the covenants, representations, and warranties in the Lease.

148.    Khushal, as successor-in-interest to Diplomat, was the lessor under the Hotel Lease.

149.     Through the Second Hotel Lease Amendment, Khushal relinquished its leasehold in the relevant portions of the Adjacent Property, including the Parking Lot and area of ingress and egress, necessary for RTI's perpetual, uninterrupted parking rights under the Lease.

150.     Khushal's lease of the relevant portions of the Adjacent Property was therefore permanently terminated through the Second Hotel Lease Amendment.

151.     Accordingly, RTI is entitled to remain on the Restaurant Property free of charge for the remainder of the term of the Lease.

152.     Despite the triggering of the Rent-Free Clause, and years of acquiescence, Lenox claims that RTI is obligated to pay rent under the Lease, and served a Notice of Default to this effect.

153.     As a direct and proximate result of Lenox's breaches under the Lease, RTO has suffered, will suffer, or is continuing to suffer, damages, costs, and other losses.

154.     The facts set forth above therefore demonstrate the existence of an actual, justiciable controversy involving specific, adverse claims regarding the interpretation and effect of the Lease and the rights and obligations of the parties, which claims are ripe for adjudication.

155.     All facts necessary for an adjudication of this dispute have occurred.

156.     The prompt resolution of this matter will assist the parties in determining their respective rights and obligations, particularly where, as here, the ability of RTO to fully maximize value for all stakeholders in the Chapter 11 Cases depends, in part, on resolution of this dispute.

157.     Accordingly, RTO seeks a judicial declaration that RTO is not obligated to Lenox or its successors-in-interest for any payments due under the Lease, and is entitled to remain on the Restaurant Property and enjoy its rights under the Lease free of charge for the remainder of the term of the Lease, including any renewal terms that are exercised in accordance with the Lease.

## Count II
### (Declaratory Judgment – Right to Setoff)

158.     RTO incorporates by reference the foregoing allegations.

159.     Pursuant to 28 U.S.C. § 2201, *et seq*., the Court has the power to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

160.     The Lease is a valid and enforceable agreement between Lenox, as the successor-in-interest to SMS, and RTO, as the successor-in-interest to RTI.

161.     The Lease contains a covenant that "Ruby Tuesday, its employees, customers, and invitees, shall have a perpetual, uninterrupted, non-exclusive right for parking."

162.     The Lease contains representations and warranties that no other document will conflict with the terms of the Lease.

163.     The Lease contains representations and warranties that "[n]o consent or approval by any governmental authority, except for the issuance of the building permit and necessary business licenses will be required on the part of Ruby Tuesday in order to transact its business under the terms of this Lease."

164.     The Lease contains representations and warranties that it "does not violate or conflict in any material way with . . . the terms of any other Lease applicable to the Adjacent Property . . . or any other document subject to any governmental approvals."

165.     Since the execution of the Lease, Lenox and its predecessors-in-interest have failed to secure and maintain the foregoing parking rights for RTI.

166.     As a direct and proximate result of the actions and inactions of Lenox and its predecessors-in-interest, RTI has made all parking rental payments directly to the City.

167. As a direct and proximate cause of the actions and inactions of Lenox and its predecessors-in-interest, RTI has been forced to undertake curing these defaults by obtaining parking rights from various entities and persons that have claimed an interest in the Adjacent Property. RTI has expended significant funds as a result.

168. As set forth above, the Lease provides that RTI is permitted to cure any default of the lessor, and to setoff all sums expended in curing that default, plus 12% annual interest, against its rent.

169. In accordance with these terms, RTI and RTO have setoff sums expended to cure the defaults of Lenox and its predecessors-in-interest.

170. The curing of the defaults and setoff by RTI and RTO against rent under the Lease has proceeded for no less than 11 years.

171. Lenox and its predecessors-in-interest are, and have been, aware of setoff by RTI and RTO under the Lease.

172. Despite the setoff procedures specified in the Lease and the parties' course of conduct, Lenox has contended that RTO is obligated to pay rent and other outstanding amounts under the Lease, and served a Notice of Default to this effect.

173. As a direct and proximate result of Lenox's breaches of its duties, covenants, representations, and warranties under the Lease, RTO has suffered, is suffering, and will continue to suffer, damages, costs, and other losses.

174. The facts set forth above therefore demonstrate the existence of an actual, justiciable controversy involving specific, adverse claims regarding the interpretation and effect of the Lease and the rights and obligations of the parties, which claims are ripe for adjudication.

175. All facts necessary for an adjudication of this dispute have occurred.

176.     The prompt resolution of this matter will assist the parties in determining their respective rights and obligations, particularly where, as here, the ability of RTO to fully maximize value for all stakeholders in its Chapter 11 Cases depends, in part, on resolution of this dispute.

177.     Accordingly, RTO seeks a judicial declaration that RTO is entitled to setoff against its rental payment obligations under the Lease all sums expended in curing the defaults and breaches of Lenox and its predecessors-in-interest.

### Count III
**(Declaratory Judgment – Lessor Contribution Satisfaction Payment)**

178.     RTO incorporates by reference the foregoing allegations.

179.     Pursuant to 28 U.S.C. § 2201, *et seq*., the Court has the power to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

180.     The Lease is a valid and enforceable agreement between Lenox, as the successor-in-interest to SMS, and RTO, as the successor-in-interest to RTI.

181.     RTI was obligated under the Lease to make monthly Lessor Contribution Rent payments.

182.     SMS assigned its right to receive the Lessor Contribution Rent to Kapoor through the First Lease Amendment.

183.     In the Second Lease Amendment, RTI and SMS agreed to eliminate SMS's obligation to pay Lessor Contribution, and RTI's obligation to pay Lessor Contribution Rent, upon RTI's payment to Kapoor of the Lessor Contribution Satisfaction Payment.

184.     RTI paid the Lessor Contribution Satisfaction Payment by check in the amount of $400,000.00, Reference Number 0001811909, dated May 13, 2005 and payable to Brij Kapoor.

185. Prior to the Petition Date, neither Lenox nor SMS informed RTI that it had failed to pay the Lessor Contribution Satisfaction Payment.

186. After the Petition Date, Lenox informed RTI for the first time that Lenox contends RTI has not paid the Lessor Contribution Satisfaction Payment, and is therefore obligated to make such payment.

187. The facts set forth above therefore demonstrate the existence of an actual, justiciable controversy involving specific, adverse claims regarding the interpretation and effect of the Lease and its amendments, and the rights and obligations of the parties, which claims are ripe for adjudication.

188. All facts necessary for an adjudication of this dispute have occurred.

189. The prompt resolution of this matter will assist the parties in determining their respective rights and obligations, particularly where, as here, the ability of RTO to fully maximize value for all stakeholders in its Chapter 11 Cases depends, in part, on resolution of this dispute.

190. Accordingly, RTO seeks a judicial declaration that RTI paid, and RTO is not obligated or liable for, the Lessor Contribution Satisfaction Payment.

## Count IV
### (Breach of Contract)

191. RTO incorporates by reference the foregoing allegations.

192. The Lease is a valid and enforceable agreement between Lenox, as the successor-in-interest to SMS, and RTO, as the successor-in-interest to RTI.

193. The Lease contains representations and warranties that no other document will conflict with the terms of the Lease.

194. The Lease contains representations and warranties that "[n]o consent or approval by any governmental authority, except for the issuance of the building permit and necessary

business licenses will be required on the part of Ruby Tuesday in order to transact its business under the terms of this Lease."

195.    The Lease contains representations and warranties that it "does not violate or conflict in any material way with . . . the terms of any other Lease applicable to the Adjacent Property . . . or any other document subject to any governmental approvals."

196.    The Lease obligated the lessor to provide RTI with parking on the Adjacent Property.

197.    As the lessor under the Lease, Lenox and its predecessors-in-interest have failed to provide RTI (and now RTO) with parking on the Adjacent Property as required in the Lease, and have therefore breached the Lease, including the covenants, representations, and warranties in the Lease.

198.    As a direct and proximate cause of these breaches, RTO has suffered damages.

199.    RTO has consistently faced the imminent risk of severe commercial harm as a result of these breaches, and has incurred significant expenses to prevent such harm, including attempting to cure the breaches of Lenox and its predecessors-in-interest.

200.    Among other things, RTO has been forced to pay additional costs, beyond what is required in the Lease, to preserve its ability to park on the Adjacent Property.  Such costs include, but are not limited to, additional rental payments to the City over the course of several years to ensure RTO's continued ability to utilize parking on the Adjacent Property, and payments to third parties to monitor, negotiate, and defend its ability to utilize parking on the Adjacent Property.

201.    As a result of breaches by Lenox and its predecessors-in-interest under the Lease, RTO is entitled to recover from Lenox all sums due together with interest at the rate of 12% per annum.

202.    By reason of the foregoing, Lenox is liable to RTO for damages in an amount to be determined at trial.

## Count V
### (Turnover – 11 U.S.C. § 542)

203.    RTO incorporates by reference the foregoing allegations.

204.    Section 542(b) of the Bankruptcy Code provides, in pertinent part:

> [A]n entity that owes a debt that is property of the estate and that is matured, payable on demand, or payable on order, shall pay such debt to, or on the order of, the trustee, except to the extent such debt may be offset under section 553 of [the Bankruptcy Code] against a claim against the debtor.

11 U.S.C. § 542(b).

205.    Lenox is an entity that owes a debt to RTO in connection with its breaches of the Lease (the "Debt").

206.    The Debt is property of the estate.

207.    The Debt is matured, payable on demand, or payable on order to RTO.

208.    Lenox has not paid the Debt owed to RTO.

209.    The Debt is not subject to setoff under section 553 of the Bankruptcy Code.

210.    Accordingly, RTO is entitled to a judgment ordering Lenox to pay the Debt to RTO in accordance with section 542 of the Bankruptcy Code.

## Count VI
### (Disallowance of All Claims – 11 U.S.C. § 502(d) and (j))

211.    RTO incorporates by reference the foregoing allegations.

212.    Lenox is an entity from which property is recoverable under section 542 of the Bankruptcy Code.

213.    Lenox has not paid the amount of the Debt, or turned over such property, for which Lenox is liable under section 542 of the Bankruptcy Code.

214.     Pursuant to section 502(d) of the Bankruptcy Code, any and all filed and scheduled claims of Lenox against the Debtors' chapter 11 estates, including without limitation the Cure Claim, must be disallowed unless and until Lenox pays in full to RTO an amount equal to the aggregate amount of the Debt, plus interest thereon and costs.

215.     Pursuant to section 502(j) of the Bankruptcy Code, any and all claims of Lenox against the Debtors' chapter 11 estates, including without limitation the Cure Claim, previously allowed by the Debtors must be reconsidered and disallowed until such time as Lenox pays to RTO an amount equal to the aggregate amount of the Debt.

## PRAYER FOR RELIEF

WHEREFORE, RTO respectfully requests that the Court enter judgment against Lenox as follows:

(a)     Declaring that the Rent-Free Clause was triggered by the Second Hotel Lease Amendment, thereby permitting RTI and any successors-in-interest to remain on the Restaurant Property free of charge for the remainder of the term of the Lease, including any renewal terms;

(b)     Declaring that RTO is entitled to setoff against its rental payment obligations under the Lease all sums expended in curing the defaults and breaches of Lenox and its predecessors-in-interest, plus interest at the rate of 12% per annum, including but not limited to parking rental payments and attorneys' fees;

(c)     Declaring that RTI paid, and RTO is not obligated or liable for, the Lessor Contribution Satisfaction Payment;

(d)     Awarding money damages against Lenox in an amount to be determined at trial, plus any additional amounts that may become due and owing, together with pre-judgment and post-judgment interest;

(e)     Ordering Lenox to pay the Debt to RTO in accordance with section 542 of the Bankruptcy Code;

(f)     Disallowing any and all filed and scheduled claims of Lenox against the Debtors' chapter 11 estates, including without limitation the Cure Claim, unless and until Lenox pays in full to RTO an amount equal to the aggregate amount of the Debt, plus interest thereon and costs;

(g)     Reconsidering and disallowing any and all claims of Lenox against the Debtors' chapter 11 estates, including without limitation the Cure Claim, previously allowed by the Debtors until such time as Lenox pays to RTO an amount equal to the aggregate amount of the Debt;

(h)     Awarding RTO its attorneys' fees and costs incurred in this action, including those related to the Cure Claim and Cure Objection, to the fullest extent allowable under the Lease and applicable law; and

(i)     Granting such other relief as the Court deems just and proper.

Dated: August 19, 2021
Wilmington, Delaware

**ASHBY & GEDDES, P.A.**

*/s/ Stacy L. Newman*
Gregory A. Taylor (#4008)
Stacy L. Newman (#5044)
F. Troupe Mickler IV (#5361)
Katharina Earle (#6348)
500 Delaware Avenue
P.O. Box 1150
Wilmington, DE  19899
Telephone: (302) 654-1888
Email:  gtaylor@ashbygeddes.com
        snewman@ashbygeddes.com
        tmickler@ashbygeddes.com
        kearle@ashbygeddes.com

*Counsel for Plaintiff*